Thank you, Your Honor. May it please the Court, Samuel Peloche on behalf of Appellants Taylor Shellfish and the Pacific Coast Shellfish Growers Association. This appeal involves a district court decision that vacated 898 existing authorizations that covered almost all shellfish farming operations in Washington State. Those authorizations were submitted pursuant to Nationwide Permit 48, which has been the primary authorizing tool for shellfish farms in Washington since about 2007. And while that nationwide permit has changed a bit over the years in its various iterations, the acreage that's authorized under that permit has been remarkably stable. As of October 2019, the acreage authorized was about a thousand acres less than the total acreage authorized under the 2007 version of the permit, the initial version of the permit. I'd like to just hit on four issues today. First, I'd like to talk about the jurisdictional issues that are before the court. I'd like to hit on the district court's merits decision, the district court's remedy decision, and finally, briefly touch on our request for an expedited decision. Now, addressing first the jurisdictional issues, there's two that have been raised by appellees, mootness and finality. First, as to mootness, I think the fundamental question before the court is, can the court grant effective relief? Absolutely, the court can. The verifications that were revoked by the district court here don't expire on their face until March of 2020, March of 2022. So if the court reverses the district court on either the merits or on the remedy, those verifications will go back into effect and allow shellfish growers to continue farming. So the court absolutely can grant relief. Now, appellees have argued that the action at issue here, and that's simply not the case. First, that permit is not yet in effect. It doesn't go into effect until March. And then secondly, well, for three reasons. First, it's not in effect yet. It doesn't go in effect till March. In addition, the Biden administration has issued a number of executive orders, I apologize, has issued a number of executive orders and a regulatory freeze that call into question whether that permit will ever go into effect. And that permit is in review in front of Congress right now under the Congressional Review Act. So it may or may not ever go into effect. That also goes to remedies, of course, and I read your 28J letter. And of course, we don't, obviously these aren't an expedited basis for review, but we know what that actually means in terms of practicality. I would appreciate your argument about the executive review. For the Corps of Engineers? No, to the court, to us. Okay. Well, you want an expedited decision, but then you're also saying, well, all of this is really thrown into uncertainty because of the executive review. So what are you asking of us in that regard? And what impact do you think that potential executive review will have on this? Well, I think a couple of things. First and foremost, the Nationwide Permit 2021, if it ever goes into effect, is separate and distinct from the authorizations that were issued here covering these shellfish farms. So I think if the court reverses, again, what we would request is that at a minimum, the court reverse the remedy decision and reinstate those existing verifications. And if those existing verifications go back into effect, they will remain in effect, even if the Nationwide Permit 2021 isn't ultimately adopted. Those existing verifications will remain in effect unless and until they're replaced by a new project-specific authorization. So what growers could do, if Nationwide 2021 goes into effect, Nationwide 48, growers could conceivably go to the court and ask for coverage under that. We know that process takes something like at least eight months based on the 2017 verification process. So I think the growers could request coverage there and ultimately may receive coverage there. But that is not a vehicle for allowing planting immediately, which is, again, one of the requests that we've made is that, and the basis of our request for expedited review, is that growers are heading into the spring planting season and they no longer have authorization to plant their shellfish farms. And so they're facing, and if they can't plant this spring, the record demonstrates they will have an inventory gap that will manifest as an inventory gap in 2022 and later years, and it'll have devastating economic impacts that would compound the impacts they're already experiencing from the COVID pandemic. And again, the record is clear, will cause some shellfish operations at least to shutter. So I have a practical, I have a question on that. We see from the record that the planting season, it begins in approximately May. Is that correct? March, March, March to May. Okay. It's March through August, September, Your Honor. Right. And so in advance of that, are there mechanical or other things that need to be done in preparation for that planting? Absolutely, Your Honor. They need, growers, if they're going to move forward with planting, need to order seed, they need to order equipment, and they need to hire planting crews. So that's, that's the basis for our request for expedited review is that growers need to make those decisions. And, you know, conversely, if the court is going to uphold the vacatur order, growers would, that will get, expedited decision will give growers some time to go through an orderly wind down of their operations so that there's not some, they're not unnecessarily expending resources that they then, they then have lost, which further compound the economic injury. So I think all that to say the growers, this court can absolutely grant relief. The 2021 permit has not mooted this case. The second jurisdictional issue relates to finality. The appellants, appellees have argued that the case is not a final judgment because it involved a remand. There was no remand. There's no remand. I think you can move. I mean, as far as I'm concerned, that seems open and shut. There's no requirement for anybody to do anything. That's our position, Your Honor. I'll just move to our discussion on the merits then. So moving to the merits, I think there's two fundamental pieces of the Clean Water Act that I want to hit on before I get into the district court's decision. First, Section 404E, which authorizes the court to adopt, adopt general permit processes. That's a provision of the act that went into effect a couple of years after the initial enactment of the Clean Water Act, when it was clear that some permits for some activities that resulted in minor environmental impacts were being, were slow to issue. And that was creating issues within the court's regulatory scheme. So the Congress authorized the court for activities that create minimal impacts to expedite, to create a general expedited permit process. It's, it's not remarkable that shellfish farming would be included in that. The Clean, one of the Clean Water Act goals is the protection and propagation of shellfish. And this court's recognized in the Affeti decision that shellfish provide environmental benefits, such as water filtration in the waters where they're farmed. Now the district court pointed to three errors, three distinct errors in the court's, in the court's Nationwide 48 adoption in Washington. And those are summarized on page six of the merits decision. First, the court, the court criticized the court's analysis is based on, quote, selectively chosen statements in the scientific literature. This just doesn't hold true if you look at the Nationwide Permit 48 decision document. The court reviewed multiple decisions, multiple scientific studies, and it's, and based its decision on impacts on those studies. In addition to, and I'll get to this, the conditions that are in place in the Nationwide Permit and the fact that the individual authorizations will be reviewed. The district court didn't actually, didn't actually take issue with the selective quotation. It took issue with the, it disagreed with the course explanation of why it was based, what of the studies it was using. And in some cases disagreed with the actual studies. And I think this is a fundamental error that was made by the district court. And that is a failure to defer to the core's expertise. This court's made clear in the conservation Congress versus Finley case that the determination of what constitutes best scientific data available belongs to the agency's expertise. This is where a reviewing court quote, must generally be its most deferential. The district court did not defer to the core's expertise. And in fact, it did exactly what it accused the core of doing. It selectively brought in a document from the administrative record, a draft impact analysis that was committed, that was prepared by a staffer in the Seattle district. The author of which described that as nonsense in its current form and relied on that document to bolster the court's impact. At the same time, the court reviewed, the court didn't review the programmatic consultation documents, which I'll talk about in some detail in a minute. But those documents were documents that evaluated the interactions of shellfish farming with all aspects of the environment and were finalized documents completed by federal agencies with significant expertise. So the court's review of the record did not adequately defer to the course, the course reasoning. Second, the second criticism of the district court was that the core relied too heavily on general permit and general conditions that were quote, too general. Those conditions limited the scope of the nationwide permit. And I think it's the case law makes clear that when the court should, that agencies, administrative agencies can use conditions to limit the scope of those actions. And here I also let me ask you, let me ask you a sort of a question that is, is in my mind at the moment, which is what is our standard of review of the district courts decision with regard to the merits of the NEPA analysis? I don't, I don't think you get it. I think that it's the, that was an analysis or that decision was based on cross motions for summary judgment. I don't think the district. So here's the, so we have de novo review, correct? Correct. So why do we care what the district court said? My, my concern is that the reasons that the court gave don't make any sense. And I think that's a plus of these sort of in-state actions. And they've got, they've got to renew these permits every five years. So I think the core adopted this tiered review as a, to, to get to a functional program that allows it to use, to use the, to implement a program. So it does a higher level review at the headquarters level. And then it does a more regional review at the division level. And then, as I said here, every individual, every one of those 898 individual authorizations was, was specifically reviewed by the court. I want to be clearly understanding your position. If we were to conclude that the nationwide review, what gave entirely invalid reasons, substantively, would the tiered review save it or would, would there have to still be a new nationwide analysis? Well, I, to, to be very clear, and I, I want to, two points on that. I, I, if the nationwide permit, if you conclude that nationwide analysis was completely wanting and they provided no adequate validation for the position in the, in the nation, national decision document, then I think you would find, you would need to find that that permit was not valid because I do not think that it's appropriate to lie exclusively on downstream review. I don't think that's what happened here. The second thing I would say though, in that instance is, is the, there's a different, a different issue on vacatur that even if that the question of vacatur is, well, I've got only three minutes remaining and let me, let me pivot to vacatur. The question of vacatur is still, is still before the court. And I want to hit on the vacatur issue. So the, the, that's the presumptive remedy, is it not? Yes, it is. But if you look at the nationwide permit cases, it's not the presumptive remedy for nationwide vacatur of an existing authorization under nationwide permits is not, has not, we can't find a single case and appellees have not cited a case where that has been, that was the remedy for invalidation. Well, that's not actually what the district court did. It sort of split the baby and it said, you know, here are situations in which planting for last year's season is permissible given the purposes of the environmental protections. So it's, it's an abuse of discretion. It's an abuse of discretion first, because the court's decision was, was entirely based on its conclusion that there was no, there is no evidence in the record of environmental impact. Okay. Let me, let me just ask the question differently. I want you to assume for the purpose of this question that the district court was correct on the merits. That is that the, that the, the nationwide analysis was inadequate. So I'm not sure whether that factored into your answer. That did, that did. I'm assuming. There has to be an all, in your view, does it have to be all or nothing? Is it an abuse of discretion for the court to say, well, here's some things that can go forward, even though vacatur would be the presumptive remedy? Well, I think, I think the, the, the fundamental error there, the clear error that the court committed, and again, recognizing that the nation, even if the nationwide permit is invalidated, the clear error of the court committed is in finding that there was nothing in the, nothing in the record to support an analysis of environmental harm. And even if the net national analysis was inadequate, the record here clearly shows these programmatic consultation documents, which are 600 pages of detailed analysis by expert agencies that support a minimal impacts determination. The court, the district court didn't even look at those and in evaluating again, now he's not evaluating the propriety of the nationwide permit. He's evaluating these individual verifications to see if they result in environmental harm. He erred in not, in not looking at those, at those particular records in those documents. I do have a question though. Again, we keep migrating back to the merits as opposed to the remedy. And so is it your position that it's an abuse of discretion on his part to have done this hybrid remedy? And that do you still take the position that it's all or nothing? It is abuse of discretion to do a hybrid remedy when that remedy was based on this, and it's again, it's not, I'm not talking about the merits. I want to be very clear when the remedy is based on the, on a conclusion that the, the record does shows environmental shows, does not give any evidence of environmental harm. And the record actually has a robust analysis of environmental harm. That's an abuse of discretion. That that's what that limited remedy was based on. And let me just ask my question again, if, if we were to disagree with your premise of what was air, do you take the position that it's all or nothing at this stage? I take the, I'm not sure what you mean by all or nothing, that it would be. Well, in other words that if, you know, you seem to have taken that position below and in terms of the maker, but is it your position that the district court doesn't have the assuming that there's not an insufficient underlying premise? I think the district, I know I'm out of time, but I'll answer your question. I think the district court is authorized to issue a limited vacatur. We just don't think that the limited vacatur here was supported by the evidence that was before the district court. And he committed clear error about not looking at that. And I would say, you know, the, the, the, and the key there is this going into this spring's planting season. Thank you. Thank you, your honor. We asked a lot of questions. You may have one minute for rebuttal on the time. And other council, I don't see that you've specifically divided up your time. Oh, but the clock shows 10. So I gather that each of you is going to take 10 minutes and I don't know which of you wishes to start. That would be me, Amy Vanson for Apelli Center for Food Safety. Commercial shellfish aquaculture has been permitted on a quarter of all Washington tidelands, which are also home to many fish, birds, invertebrates, and of course, people. Aquaculture uses synthetic inputs like plastics and pesticides, and it can harm the substrate, aquatic vegetation, biodiversity, and water quality. Today, I would like to concentrate on two points because it sounds like from your comment, you don't want to hear about Elsie Valley and the remand rule issue. So I'll turn to the merits. On the merits, the district court here held that the Army Corps violated principal Clean Water Act and National Environmental Policy Act provisions. These violations were not and cannot be cured by Endangered Species Act documents, even if they were incorporated because the ESA looks at different impacts. And second, the remedy decision properly applied the vocator test and on abuse of I will note that my colleague, Mr. Anuda, will be addressing further the merits issue of deference to the agency and additional points on the remedy. Turning to the merits. I don't know if you're the right person to ask about the remedy question or not. It seems as if none of there's no quarrel from your end, at least as I understand it, with the hybrid remedy that the district court fashioned. Some planting last year in areas that were deemed not to create the problems that were otherwise identified. And if I'm correct about that, what is your position with respect to continuing that same permission, if you will, into the next planting season? Well, Judge Graber, below we, Center for Food Safety, as well as the coalition, proposed that there be a compromise and a partial vocator that would allow harvest to continue under the permit because we recognize there was already shellfish in the ground and out in the tidelands. We didn't favor allowing planting in the 2020 season. However, we have not challenged that with very serious errors here. The economic harms are great too. I don't think they're just alleged, but I understand your position. So bottom line, what is your position with respect to continuing in the next season? What happened in the previous one? Our position is against it. The problem with this permit is that the analysis was never done at the outset to ensure that these impacts would be minimal. So allowing the continued planting and all the activities under the permit would really vitiate the statutes here. NEPA requires that analysis to happen. But it doesn't allow them all. It allows only a small proportion where the court made a determination that it wouldn't be harmful. So do you disagree with the harmfulness analysis? Or what is your position other than that the permit was improper? You seek complete vacature? Well, we think that the partial vocator that happened was appropriate enough. And again, we don't challenge that. I don't think that going forward were it to continue in this manner, it would be a small amount of the overall you know, over 35,000 acres with the district court. The limitation it put on it was as to mature eelgrass beds. We don't exactly know what standard that is using that was suggested by the tribes in this case. And so there's no there's no evidence here that it would be a small amount of plantings. And I think, in fact, it would be the majority of this. No, but the court's small or large that it wasn't harmful, as harmful as the other areas of planting and harvest. And so I haven't heard you come to grips with that and whether that was a permissible understanding of the record on the district court's part. Well, I don't think that the harmful I think it was, again, to mitigate some of the disruptive consequences here. But the court still correctly found that vacating the permit was required because the seriousness of the error outweighed the disruptive consequences going forward. So to continue that on would be more planting than the court allowed. And the court allowed one season of planting. So another whole season is really doubling those impacts. And so, you know, I think it wouldn't be the same ruling as the court made or the court would have said you can plant for the rest of the permit and it would have allowed planting in 2021. And so it didn't here. And I think that was correct. I want to make a point about the vacating the entire permit, including all the authorizations underneath the permit. That was proper because vacater is not an injunction. It's not narrowly tailored. And all of those authorizations were just approvals or okays to use the nationwide permit, which is a single permit. This is, you know, as the district court found, they're not standalone permits. They have no legal effect on their own. And as this court held in Idaho sporting Congress, that's 305 F 3rd 9 5 7. That was a forest plan issue. But when the when the overall programmatic type analysis is found to be inadequate, activities that are permitted under that should also have to be vacated. And that's even a much different case here, because in forest type activities, there's usually more NEPA process here. There's no further NEPA that is ever done for these authorizations under a nationwide permit. The only NEPA process is at the national level. And that's, in fact, the only EA. And that was inadequate because it ignored impacts such as cumulative effects. It did not look at the impacts of pesticides or plastics. It also didn't consider the context and intensity factors. Now, this wasn't addressed so directly by the district court, but this is a major problem because an EA has to show that an EIS is not required. And to do that, you know, they need to look at the context and intensity factors. So if you compare ER 10 59 to 11 0 5 with ER 9 3 6 to 4 7, you'll see that actually the draft cumulative impacts in the record did this analysis, but it was never used by the Corps, and it was never made public. So these are fundamental problems that mean that a nationwide permit should not issue. And I'll also say that under the Clean Water Act, nationwide permits are not required. So this three-tier process, you know, idea, it's not necessary that Army Corps uses these permits. It's allowed to use them when they can show that the cumulative and individual effects will be only minimal. And so that finding needs to be made supported by, you know, documentation and, you know, part of public comment. So the fact that there might be some, you know, ESA documents in the record simply does not fix the main errors that were made here in the national decision document. I would also point out that that document did not incorporate these ESA documents in any way. The appellants here cannot supply a post hoc rationalization to the Army Corps that it itself never asserted. That's bedrock administrative law under State Farm. You know, we look at what the basis that the agency itself articulated. And it's not contested here that the national decision document, which is the only NEPA document, did not cite to or diversity project be Blackwood, which is 161 F3-1208. The agency has to show that there's no need for an EIS within the EA itself. Even if there's documents in the record, that does not suffice because the EA has to cite and describe them. It has to, as it said, as this court said, show the agency's defense in the EA. And that didn't happen here. Not only is there a failure to cite these ESA documents, but in fact, again, no discussion of plastics despite their pervasive use, no discussion of pesticides, as you noted, no discussion really of the effects to Washington State, even though this permit is used over 92% of the time in Washington. So while it's nationwide, it really is mostly Washington. And I think you'll also find that the national decision document doesn't mention geoduck even once. And that's one of the more harmful types of aquaculture here because it uses 42,000 plastic PVC tubes per acre covered in plastic netting, high pressure water jets to harvest the geoduck, which causes plumes of sediment into the water. So the fact that that was left out of any analysis in the national decision document means that it simply did not support the decision. So here we would say again, that the district court as to the remedy correctly found that these violations went to the heart of the Clean Water Act in NEPA, that's at ER 33. And the question is not whether we can prove that there will be harm to the environment, but rather whether that procedure was skipped as the DC court found in the Standing Rock decision that we filed in the 28J. So for all of these reasons, we ask that you affirm the district court's remedy and merits order. I see my time is up. Thank you. Thank you, counsel. Mr. Anuda, you're up. Thank you, your honor. Let me start right where Ms. Benson left off with geoduck clams. The district court's remedy decision was based on his review of the record, which showed that there are by the under the existing authorizations, the 800 to say nothing of the additional 40,000 additional acres that could be planted under the permit. There are already 729 million additional shellfish that have been added to Puget Sound by the existing geoduck operations to say nothing of how many oysters or clams are also added of other types. That's why the district court was taking so much care to try and fashion a remedy. He recognized, and this is a well-seasoned, respected jurist from the Western District, Judge Lasnik. He recognized that there is some economic consequences here of bockature, even though that's what the law specifically mandates. But he wanted to try to propose the compromise that was ultimately adopted, which the appellants now say is inadequate. And as Judge Lasnik noted in his opinions, the appellants didn't propose any compromise. They just wanted, as one of you noted, an all or nothing situation. So the court was doing its best and under an abusive discretion standard, I would argue, did a phenomenal job of trying to balance these remedies or these situations here. The court was faced, as Ms. Manson noted, with what would be doubling the impact if he were to allow another season. He did find that adopting the compromise would be possible and that it would be perhaps less harmful. But he didn't say there were no impacts. And if you are a visual person and you want to get a sense of the impacts here, I would encourage you to look at SER 592-99, SER 661-62, 682-867, and in the underlying record at 9503-553. There's some powerful visuals that show you exactly what happens in each one of these operations. I would also note that you have 72,000 acres of impacts. We only have 38,000 so far because Judge Lasnik issued a ruling that vacated the permit. The permit, the NEPA documents, still have to be able to justify why 72,000 of these acres of operations are allowed. We already have... I have just a sort of factual question, and I'm not sure this is easily answered, but you may know the answer. As I understand the court's ruling for 2021, the only permissible planting allowed under the district court's order is that which is protected by treaty rights. Am I correct about that? That is my understanding as well. And so what is the sort of area or percentage of permits or whatever? How does that relate to the whole number that was allowed in 2020 and the whole number altogether? In terms of what percentage is the tribal portion? Right. Unfortunately, that I do not know the answer to, Mr. Plachet may, but my understanding is it's quite modest because most of the tribal plantings are in North Puget Sound. Most of the industrial scale aquaculture operations authorized under Nationwide 48 are in South Puget Sound. That's what some of those maps I was just citing to show. And so the problem for the sound is that there's never been a cumulative impact analysis done that outlines what the impacts of these many thousand operations, well, 800 so far, but what authorized in the permit is more. There's no analysis of what the effect is on, whether it's orcas, salmon, forage fish, eelgrass. It doesn't exist except in a draft from the Seattle district. And Judge Lasnik was careful to note that that draft stands in stark contrast to what was actually approved and what was actually relied on by the Corps. That draft, relying on the same ESA documents that the appellees now say the district court ignored, au contraire. That draft shows that relying on those documents produces a finding of significant impact, even for only the limited scope of that draft, which admitted on its own terms is only a partial draft. Those ESA documents show on there below that there is going to be significant impacts. That means there should have been an EIS at the national level. Now, Mr. Plache talked about tiering, and that's an important issue here. There's nothing wrong with tiering your decision, your process for approving. There is fundamentally something wrong with trying to tier your NEPA analysis or your Clean Water Act analysis or your APA justification for both. You can't tier those decisions down to a district engineer. I would also note that if you read his opinion closely, Judge Lasnik found that there was no evidence in this record that the district engineer in Seattle, covering the state of Washington, had ever actually exercised that hypothetical discretion that the Corps at the national level was relying on. That's kind of telling. If I go back to the remedy issue, Judge Lasnik talks about the absence of meaningful assistance from the Corps in trying to fashion a remedy and the interveners. So it adopted a remedy based on suggestions of the plaintiffs Amici and the Swinomish Tribe. And in the end, apart from the that was ongoing at the time, just to clarify what Judge Graber asked you, the meaningful deviation would really relate solely to the tribes at this point. Is that correct? Well, not entirely, Judge McKeon. The district court decision also allowed harvest through this of prior plantings if the permittees or the verified authorized operations had applied for an individual permit by December. So to the extent that any operator, and that was in his decision, in the judge's decision in June. So they had six months to know that, oh, okay, I got to that. My understanding is that's correct, that they are not going to be able to plant under Judge Lasnik's decision for a period of potentially a year or April through September or October, if you include geoducks. I would note that there's an interesting causation issue here. If the new nationwide permit goes into effect, and as it will potentially in March, there's no effect on planting from the evocator really, because all those people applying for authorizations, if they can't plant, it's because the core process is moving too slow under the nationwide permit. That's not being caused by the evocator, that's being caused by the core. I would also note that you have to remember practically, this is a five-year permit. The growers all knew when they got their original authorizations, it was only for five years, the effect of the evocator was only going to lose one year, and then they would have been out of a permit anyway. They always plan on, well, there's a possibility, at least I assume they do, they should, that there's a possibility I won't get another authorization. So I need to take that account. So this is a situation where the growers knew from the start that we were seeking evocator. Ultimately, the judge decided to go with a compromise on that, because we thought that that was an appropriate way to go. Let me ask you just on that. I mean, the compromise ultimately is yes, you can harvest if it's already planted, but there's no further plantings, save the tribe. Did the plaintiffs or Amici offer any other compromise at that time, other than primarily the tribal compromise? Was there any other compromise that was in the record that the judge didn't adopt? There were no other compromises in the record that the judge did not adopt, Your Honor. I will sum up by noting that Mr. Plachet mentioned that the court, that they felt Judge Lasnik didn't give the core deference on its expertise. I would note that, in fact, the court, this court has been really clear, and you defer to an agency if it has a rational basis or a reasonable explanation for its approach. Judge Lasnik found that the court didn't hear, and the agency can't ignore its own experts, and Dr. Przycki, who did the draft cumulative impact analysis, was entirely ignored here. I would ask that you uphold the district court's decision. Thank you. Mr. Plachet, you may have a minute for rebuttal. Thank you. I'm going to hit three things, if I can. One, we have always proposed a compromise vacateur. We have proposed what has been adopted in every other nationwide permit case, which is a prospective-only vacateur. We've supported that remedy from the get-go. We are asking only that the retroactive aspect of this vacateur be reversed. Second, in terms of whether the district court, the district engineer has considered, has further conditioned the permits, the record is clear that every one of these individual verifications contains 32 additional conditions that are aimed at addressing exactly the environmental impacts that the district court was concerned about. And then finally, just in terms of our request for expedited review, I recognize that we're asking for a rapid review. We would request, if there's any way for the court to give some indication whether it's going to uphold or reverse the court's decision on vacateur, it would allow growers to plan economically, whether they should be ramping up for a planting season or winding down their businesses in light of not being able to plant. So if there's any way to get even some brief to be followed by a full decision indication of where the court's going to go, that would be very helpful for shellfish growers. I know your time is up, but I just want to clarify one thing you said. You had proposed a prospective-only, but when would your prospective begin? As of the date of the court's order, which is already in effect because the Corps of Engineers withdrawn Nationwide 48 in Washington for any further approvals. The only thing we've objected to is the revocation of the 898 authorizations for existing applications. Thank you for the clarification. Thank you, counsel. The case just argued is submitted. We appreciate helpful arguments from all three of you. And with that, we will be adjourned for this morning's session. Thank you, your honor.
judges: McKeown, Graber, Paez